UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

CAPITOL AGGREGATES, INC.,

    *Plaintiff*,

v.                                                                    Case No. 5:23-CV-00719-JKP

IPEC, INC.,

    *Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant IPEC, Inc.'s ("IPEC") First Amended Motion for Summary Judgment. *ECF No. 32*. Plaintiff Capitol Aggregates, Inc. filed a Response, to which IPEC filed a Reply. *ECF Nos. 33, 34*. After due consideration of the parties' briefings, the summary judgment evidence, and the applicable law, the Court GRANTS-IN-PART and DENIES-IN-PART IPEC's Motion for Summary Judgment. *ECF No. 32*.

## BACKGROUND

This case arises out of an agreement between Defendant IPEC, Inc. ("IPEC") and Plaintiff Capitol Aggregates, Inc. ("Capitol") for IPEC to construct a Finish Grinding Mill and a Material Handling System. *ECF No. 27 at 1*. The facts, as alleged in Capitol's First Amended Complaint and taken in the light most favorable to Capitol, are as follows.

On February 19, 2021, IPEC and Capitol entered into a Construction Services Agreement ("CSA") whereby IPEC agreed to construct, install, start-up, test, dry-run test, and commission a Finish Grinding Mill and a Material Handling System ("the Project") at Capitol's cement plant located at 11551 Nacogdoches Road, San Antonio, Texas. *Id. at 3*.

The Project required IPEC to perform the removal and replacement of certain equipment located atop silos. *Id. at 3*. Specifically, Capitol tasked IPEC with "t[ying] in dust collectors from the FM 9 [P]roject to silos 12, 14, 15, 16, and 17." *Id. at 3*.

During IPEC's installation of a "hopper to the roof of silo 15," IPEC allowed a metal plate to be dropped into the silo causing damage. *Id. at 3*. After the metal plate's removal, and replacement of equipment atop the silos, IPEC performed waterproofing measures. *Id. at 3*.

In June 2021, Capitol discovered water entered the silos and that IPEC improperly sealed the tops of the silos. *Id. at 4*. The water "caused the dry aggregate cementitious material inside the silos to solidify, effectively filling [them] with solid concrete." *Id. at 4*. Subsequently, Capitol informed IPEC and IPEC put its insurer on notice of the claims. *Id. at 4*. However, neither IPEC nor its insurer made any remediation attempts. *Id. at 4*.

Capitol undertook remediation procedures in order to get the cement plant operating again. *Id. at 4*. The remediation procedures included "chipping away the now-solid material within the silos . . . to remove it, properly waterproofing the prior penetrations at the top of the silos, and replacing all the destroyed aggregate." *Id. at 4*. The remediation procedures resulted in damages to Capitol of not less than $1,748,774.04. *Id. at 4*.

Following these events, Capitol filed suit. *ECF No. 1*. In its First Amended Complaint, Capitol asserts causes of action against IPEC for breach of contract and negligence, seeking damages for "Repair and Remediation Costs" in the amount of $867,499.04 and for "Destroyed Cement" in the amount of $881,275.00. *ECF No. 27 at 4–6*.

IPEC moves for summary judgment. *ECF No. 32*. In its Motion for Summary Judgment, IPEC argues Capitol waived all causes of action related to IPEC's services or, in the alternative only, Capitol waived "lost product" and "demurrage" damages. *Id. at 4–5 and 9–13*.

**LEGAL STANDARD**

Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993).[1] "A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). A genuine dispute for trial exists if the record taken as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law." *Celotex,* 477 U.S. at 323; *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). The movant is not required to negate the elements of the nonmovant's case but may satisfy its summary judgment burden by demonstrating the absence of facts supporting specific elements of the nonmovant's cause(s) of action. *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075, 1076 n. 16 (5th Cir. 1994). To satisfy this burden, the moving party must provide affidavits or identify any portion of the pleadings, discovery or admissions that demonstrate the absence of a triable dispute of material fact. *Celotex*, 477 U.S. at 323; *Rodriguez*, 980 F.2d at 1019. "If the moving party fails

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).

If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586–87; *see also* Fed. R. Civ. P. 56(a). Upon the shifting burden, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which this evidence raises a genuine dispute of material fact. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994)). Further, should the nonmoving party fail "to address or respond to a fact raised by the moving party and supported by evidence, then the court may consider the fact as undisputed" and "[s]uch undisputed facts may form the basis for a summary judgment." *Broadcast Music*, *Inc. v. Bentley*, 5:16-CV-00394, 2017 WL 782932 at *2 (W.D. Tex. Feb. 28, 2017).

In determining the merits of a motion for summary judgment, a court has no duty to search the record for material fact issues or to find a party's ill-cited evidence. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ragas*, 136 F.3d at 458. In addition, a court may not make credibility determinations or weigh the evidence and must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co.*, *Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citations omitted).

### ANALYSIS

In its Motion for Summary Judgment, IPEC argues Capitol waived all causes of action related to IPEC's services or, in the alternative only, Capitol waived "lost product" and "demurrage" damages. *ECF No. 32 at 4–5 and 9–13.*

## I.    Capitol's Alleged Waiver of All Causes of Action

IPEC contends its summary judgment evidence, excerpts from the deposition of Capitol's Project Manager Jeff Weyel ("Weyel"), indicates it is undisputed Capitol "elected to forego every remedy available to it" by "issu[ing] payment for the entire amount owing under the parties' contract." *ECF No. 32 at 4–5.* In response, Capitol argues is it not undisputed Capitol intended to "waive all rights it had under contract, at law, or at equity." *ECF No. 33 at 6.*

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id.* "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver." *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). As explained by the Texas Supreme Court:

> Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right. Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, as in this case, the question becomes one of law.

*In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (quoting *Jernigan v. Langley*, 111 S.W.3d 153, 156–57 (Tex. 2003) (citations omitted)). Under Texas law, waiver is an affirm-

ative defense, and the party asserting waiver has the burden of proof. *Castle Hills Pharmacy, LLC v. Trial*, No. 14-13-00172-CV, 2014 WL 3587382 at *5 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

IPEC points the Court to the following exchange in the excerpts from the deposition testimony of Weyel:

> Q. And your understanding was that by authorizing the payment, you had conveyed that the work had been completed to the satisfaction of Capitol, correct?
>
> A. Yes.
>
> Q. And is it your -- is it your testimony that you talked to the CEO before you signed off on this?
>
> A. Yes.
>
> Q. And he directed you to do it?
>
> A. Yes.
>
> Q. Correct. So the CEO, the highest executive within the company who is not an owner, authorized the release of the retainage, the final payment to IPEC, correct?
>
> A. Correct.

*ECF No. 32-2 at 9*. IPEC further points the Court to the "Pay Application" Weyel signed, shown to him during his deposition. *ECF No. 32 at 5*. The Court notes neither party provided any of the exhibits shown to Weyel during his deposition, however.

In response, Capitol contends specific CSA provisions preserve Capitol's right to seek recovery. *ECF No. 33 at 6–7*. Applicable here are Article 6.4 and Article 19.10 of the CSA. *ECF No. 32-1 at 32, 63*. Article 6.4, entitled "Payment Not Acceptance," states:

> **No payment to Contractor by Owner** will constitute an acceptance of any of the Work furnished by Contractor or **will relieve Contractor of any of its obligations or liabilities with respect thereto**

*Id. at 32* (emphasis added). Article 19.10, entitled "No Waiver of Rights," states:

> Except as may be specifically agreed in writing, **the failure of Owner or Contractor to insist in any one or more instances upon the strict performance of any one or more of the provisions of this Agreement or to exercise any right herein contained or provided by law or equity, will not be construed as, or constitute in any way, a waiver, modification or relinquishment of the performance of such provision or right(s)**, or of the right to subsequently demand such strict performance or exercise such right(s), and all such rights will continue unchanged and remain in full force and effect.

*Id. at 63* (emphasis added). Capitol further points the Court to the deposition testimony of Capitol's Risk Manager Erika Kilgore Farmer ("Farmer") wherein IPEC's counsel allegedly refers to an insurance claim filed by Capitol with IPEC's commercial liability insurer. *ECF No. 33 at 6; ECF No. 33-1 at 4*.

IPEC fails to point the Court to sufficient summary judgment evidence of Capitol's specific intention to waive its alleged contractual right to seek remedies for IPEC's alleged defective work. While Weyel's testimony indicates Capitol authorized the final payment to IPEC, it does not imply Capitol "elected to forego every remedy available to it." *See Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005) ("While waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right."). This is so given the limited evidence IPEC provides the Court and the fact, as IPEC states in its Motion, Farmer testified as Capitol's Corporate Representative—not Weyel. *ECF No. 32 at 6*.

Capitol points the Court to specific CSA provisions, *supra*, preserving Capitol's right to seek recovery. These CSA provisions are directly at odds with IPEC's contentions. In addition, Farmer's testimony indicates the existence of an insurance claim filed by Capitol with IPEC's commercial liability insurer. *ECF No. 33-1 at 2, 4*. The Court agrees with Capitol this evidence indicates a lack of intent to waive recovery. *ECF No. 5–8*. As Capitol provides summary judgment evidence raising a genuine dispute of material fact regarding its specific intention to waive

recovery, the Court is unable to hold the surrounding facts and circumstances are undisputed, as IPEC claims.

Accordingly, as to IPEC's argument Capitol waived all causes of action related to IPEC's services, IPEC's Motion for Summary Judgment is DENIED. *ECF No. 32*.

## II.    Capitol's Alleged Waiver of "Lost Product" and "Demurrage" Damages

### A.    Proper Characterization of "Lost Product" and "Demurrage" Damages

The Court initially observes "lost product" and "demurrage" damages are not included as examples of consequential damages waived in the CSA. *See ECF No. 32-1 at 55, infra*. Despite this, and with little reference to authority, IPEC asserts both represent consequential damages. *ECF No. 32 at 10–13*. The first question therefore is whether, at the summary judgment level, the Court can properly characterize these categories of damages.

The general measure of damages in a common-law breach of contract claim is just compensation for the loss or damage actually sustained, commonly referred to as the "benefit-of-the-bargain." *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). The "benefit-of-the-bargain" measure represents the difference between the value expected from the contract and the value actually received by the non-breaching party. *Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 111 n. 5 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). The proper measure of damages is a question of law for the court, and the court's charge should limit the jury's consideration to facts that are properly a part of the damages allowable. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.-Houston [14th Dist.] 1999, pet. denied).

Actual damages are either "direct" or "consequential." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Direct damages are those that flow naturally and necessarily from the breach. *Id*. "Direct damages compensate for the loss, damage, or injury

that is conclusively presumed to have been foreseen or contemplated by the party as a consequence of his [or her] breach of contract or wrongful act." *Id.* "Consequential damages" are those which result naturally, but not necessarily, from the breach. *Id.* Consequential damages must be foreseeable and must be directly traceable to the wrongful act and result from it. *Id.*

A general measure of damages is subject to any agreement the parties might have made with respect to damages because parties to a contract are free to limit or modify the remedies available in the event of a breach of the contract. *GT & MC, Inc. v. Tex. City Refining, Inc.*, 822 S.W.2d 252, 256 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *see also Heafner*, 12 S.W.3d at 110–11 (reversing award of consequential damages when contract excluded liability for consequential damages).

The CSA reflects Capitol and IPEC agreed to limit the remedies available in the event of a breach of the contract. As a result, Capitol's ability to recover its full expectancy interest, or the full benefit of its bargain, is subject to limitations. The Court therefore considers the nature of the contractual limitations and whether they apply to "lost product" and "demurrage" damages.

The parties agreed at Article 15 of the CSA to limit the remedies available, as follows:

> TO THE MAXIMUM EXTENT ALLOWED BY LAW, AND A SUBJECT TO THE EXCLUSIONS IN THIS PROVISION, **OWNER HEREBY WAIVES AND RELEASES** AND SHALL ENSURE THAT EACH MEMBER OF THE OWNER GROUP WAIVES AND RELEASES **EACH MEMBER OF CONTRACTOR GROUP, FROM AND AGAINST ANY AND ALL CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE AND EXEMPLARY DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF USE, PROFITS, REVENUE, FINANCING, OPPORTUNITY OR GOODWILL**), WHETHER OR NOT FORESEEABLE, AND REGARDLESS OF ANY BREACH OF CONTRACT, TORT (INCLUDING BREACH, NEGLIGENCE OR STRICT LIABILITY OF ANY MEMBER OF THE CONTRACTOR GROUP) STATUTE, IN EQUITY OR ANY OTHER THEORY OF LAW, OR FAILURE OF THIS AGREEMENT FOR WANT OF ITS ESSENTIAL PURPOSE, AND REGARDLESS OF WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*ECF No. 32-1 at 55* (emphasis added).

The parties do not dispute Article 15 precludes recovery for consequential damages. Rather, IPEC contends Capitol's "lost product" and "demurrage" damages fall under the category of consequential damages and are barred. Capitol contends they are direct damages and are not.

It is a basic premise of contract interpretation that unambiguous contracts are construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983). When a contract is unambiguous, "the court must enforce it as written." *Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). In construing the contract, the Court attempts to ascertain the parties' true intent "as expressed in the instrument." *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). The Court presumes the parties intended for every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). The Court gives terms their plain, ordinary and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Id*.

The Court applies these rules of construction to determine whether Article 15 precludes Capitol's recovery of "lost product" and "demurrage" damages. The Court notes neither party argues the CSA is ambiguous, and by its plain language, Article 15, entitled "Limitations of Liability," provides Capitol agreed to release IPEC from any liability for any "consequential, indirect, incidental, special, punitive and exemplary damages." *Id*. Such damages within this provision are defined as including "loss of use, profits, revenue, financing, opportunity or goodwill." *Id*.

In attempting to harmonize Article 15 with the other terms of the CSA, the Court notes Article 3, entitled "Contractor's Responsibilities," and Article 8, entitled "Contractor's Warran-

ties," indicate IPEC assumed certain risks. *ECF No. 32-1 at 14–25 and 37–40*. Article 3.24, entitled "Use of Site," states:

> **Contractor will assume full responsibility for any damage to the Site** or of any land or areas contiguous thereto **resulting from the performance of the Work**. Contractor will restore to original condition all property not designated for alteration by this Agreement.

*Id. at 24* (emphasis added). Article 8.3, entitled "Contractor's Warranty Work," states:

> **Contractor will bear all costs and expenses associated with correcting any Defective Work. Such costs will include, without limitation, the costs of necessary disassembly, transportation, reassembly, retesting, reworking, repair, or replacement of such Defective Work, as well as any other part of the Project adjacent thereto or functionally related thereto**, or the work of other contractors damaged by the Defective Work being repaired or replaced, engineering fees, and the costs of testing reasonably required to verify that the repaired or replaced Work conforms to the applicable Warranties and the requirements of this Agreement.

*Id. at 38* (emphasis added). As a result, IPEC agreed to assume certain risks and extended a guarantee with regard to damage and defective work.

Before proceeding with its analysis, the Court notes at this juncture both IPEC and Capitol each fail to cite a series of federal and Texas judicial decisions addressing this legal issue. *See, e.g., Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *McKinney & Moore, Inc. v. City of Longview*, No. 14–08–00628–CV, 2009 WL 4577348 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Balfour Beatty Rail Inc. v. Kansas City S. Ry. Co.*, No. 3:10-CV-1629, 2012 WL 3100833 (N.D. Tex. July 31, 2012); *BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440 (N.D. Tex. 2015); *Kiewit Offshore Services, Ltd. v. Dresser-Rand Glob. Services, Inc.*, No. CV H-15-1299, 2016 WL 4564472 (S.D.

Tex. Sept. 1, 2016), *aff'd*, 756 Fed. App'x. 334 (5th Cir. 2018); *Harper v. Wellbeing Genomics Pty Ltd.*, No. 03-17-00035-CV, 2018 WL 6318876 (Tex. App.—Austin Dec. 4, 2018, pet. denied).

Instead, to support its contention "lost product" and "demurrage" damages represent consequential damages, IPEC relies on *El Paso Marketing, L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138 (Tex. 2012). *Wolf Hollow* is distinguishable because the Texas courts applied Article 2 of the Uniform Commercial Code ("UCC") and not common law principles. *See Wolf Hollow I, L.P. v. El Paso Mktg., L.P.*, 329 S.W.3d 628, 638 (Tex. App.—Houston [14th Dist.] 2010), *rev'd*, *id*. The Texas common law and the UCC do not utilize the same definitions of direct and consequential damages. *Wade & Sons, Inc. v. Am. Standard, Inc.*, 127 S.W.3d 814, 823–24 (Tex. App.—San Antonio 2003, pet. denied). The Court notes neither party argues the agreement between IPEC and Capitol for IPEC to construct a Finish Grinding Mill and Material Handling System involved the sale of goods or the CSA contains elements of both the sale of goods and the provision of services. In addition, neither party addresses the UCC, or argues its applicability, in their briefings.

### 1.    "Lost Product" Damages

IPEC contends its summary judgement evidence, excerpts from the deposition testimony of Capitol's Risk Manager Erika Kilgore Farmer ("Farmer"), indicates Capitol's "lost product" damages equate to damages for consequential "lost profits" which are barred by Article 15. *See ECF No. 32 at 12–13*. In response, Capitol counters its "damages are the direct result of IPEC's defective work and not included in the contractual waiver provision." *ECF No. 33 at 12*.

In *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, a Texas Court of Appeals held a limitation on consequential damages—including "indirect, special, incidental or consequential

loss," like the one here—"does not preclude the recovery of direct damages involving loss of use, opportunity, or profits" when they "can be conclusively presumed to have been foreseen or contemplated." *Tennessee*, 2008 WL 3876141 at *6–9.

In the excerpts from the deposition testimony of Farmer, she states the value of Capitol's "lost product" damages "for cement that was wasted . . . is the market value based on an average sales price for the previous two years." *ECF No. 32-4 at 7–8*. Farmer further states it "is what we thought was a fair value to use," but it is not a loss of sales. *Id. at 11* ("I don't think that Exhibit 65 is a loss of sales. I mean it was a direct cost of damaged product"). The Court notes neither party provided any of the exhibits shown to Farmer during her depositions.

While IPEC argues Capitol's "lost product" damages equate to damages for consequential "lost profits" which are barred by Article 15, the Court notes Article 15 "does not create a blanket prohibition of damages measured by the loss of profits *unless* those lost profits are "CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE AND EXEMPLARY DAMAGES." *ECF No. 32-1 at 55; Harper*, 2018 WL 6318876 at *10. The phrase "profits" in Article 15 comes after the word "including," which means the CSA excludes only consequential, indirect, incidental, special, punitive and exemplary lost-profit claims, not direct lost-profit claims. *ECF No. 32-1 at 55; Harper*, 2018 WL 6318876 at *10 (citing *Tennessee*, 2008 WL 3876141 at *7, 11). In addition, as stated *supra*, Article 3 and Article 8 of the CSA indicate IPEC assumed certain risks and extended a guarantee with regard to damage and defective work.

Without knowing more about the circumstances, including evidence of the cause and nature of the "lost product" damages, the Court will not conclude they are consequential "lost profits" as a matter of law. *See, e.g., City of Waco v. Kleinfelder Cent., Inc.*, No. 6:15-CV-310 RP, 2016 WL 5854290 at * 6–8 (W.D. Tex. Oct. 6, 2016); *In re ATP Oil & Gas Corp.*, 517 B.R. 756,

768 (Bankr. S.D. Tex. 2014). The Court notes IPEC's summary judgement evidence, excerpts from the deposition testimony of Farmer, also does not demonstrate there is no genuine dispute as to any material fact on this issue.

Direct damages are often referred to as "loss of bargain damages" because they reflect a failure on the part of the defendant to live up to the bargain it made. If the alleged "lost product" damages relate to damages IPEC is contractually responsible for remedying and therefore can be conclusively presumed to have been foreseen or contemplated, then these might constitute "loss of bargain damages."

Accordingly, as to Capitol's "lost product" damages, IPEC's Motion for Summary Judgment is also DENIED. *ECF No. 32*.

### 2.    "Demurrage" Damages

IPEC next contends its summary judgment evidence, excerpts from the deposition testimony of Farmer, indicates Capitol's "demurrage" damages equate to consequential damages which are barred by Article 15. *See ECF No. 32 at 9–12*. In response, Capitol points the Court to a portion of Farmer's testimony wherein she states these are direct damages. *ECF No. 33 at 11*.

Given the limited evidence the parties provide the Court, the scope of Capitol's "demurrage" damages is not entirely clear; however, the deposition testimony of Farmer provides insight. Because IPEC provides excerpts of Farmer's testimony only, the Court reviews the full transcripts of Farmer's testimony provided by Capitol. *See ECF Nos. 32-3, 32-4, 33-1, 33-2*. In reviewing the full transcripts of Farmer's testimony, the Court observes the following references to "demurrage" damages in Farmer's January 16, 2024, testimony:

The demurrage is what we paid the truckers to turn away.

. . .

This is a component of our claim because these are the trucks that got turned away, and the demurrage is the amount that we had to pay them for their contract for turning them away and not fulfilling their obligation.

. . .

So what this demurrage about is, is it's the difference they had to pay to go get it from someone else.

*ECF No. 33-1 at 9, 18*. The Court further observes the following references to "demurrage"

damages in Farmer's May 13, 2024, testimony:

[W]e have the demurrage charges where – it was the time that the trucks waited while they couldn't – while they were waiting to be filled out from the silos until – for every hour that they have to sit there and wait, there is a charge in their contracts that we have to pay.

. . .

So this is one of the things that I learned more about with the additional request. So this is the charges for the time the trucks spent waiting at the facility to be loaded out.

. . .

So I had actually misspoke in my previous deposition about this.

. . .

I would put this under a direct damage because there was time – because of the material not being able to be loaded into their trucks, they had to sit there and wait and we had to pay them for that time that they waited to be filled out.

. . .

The root cause of the wait time is because there were chunks in the material and it was taking longer to load out the trucks to try to filter the material to try to get as much as possible out of the silos.

*ECF No. 33-2 at 4, 6*. The Court again notes neither party provided any of the exhibits shown to

Farmer during her depositions.

Whether Capitol's "demurrage" damages relate to what Capitol paid truckers to turn away or the time the trucks waited, courts in several analogous situations—specifically considering the subject of fees and penalties assessed pursuant to third-party contracts—have found damages arising under a collateral contract are consequential in nature. *See Kiewit*, 2016 WL 4564472 at *9; *Balfour*, 2012 WL 3100833 at *19 (holding defendant's counterclaim to recover fees paid to third party as a result of plaintiff's delays were barred by the contract's consequential damages waiver, and explaining the court could not conclude the fees paid to the third party were "conclusively presumed to have been foreseen or contemplated" by the plaintiff as a result of its failure to timely complete the project); *Tennessee*, 2008 WL 3876141 at *11 ("[E]ven if [defendant's] conduct constituted a breach of the Contract, we conclude that [plaintiff's] damage is indirect or consequential because it involves a relationship outside of the Contract between [plaintiff] and [defendant]; namely, this claim involves a penalty [plaintiff] owes under its contract with its utility company.").

Similarly, in this case, Farmer's testimony in both of her depositions indicates Capitol's "demurrage" damages are based on charges or fees paid pursuant to "contracts" with third parties. *ECF No. 33-1 at 18; ECF No. 33-2 at 4*. These "demurrage" damages therefore depend entirely on facts "beyond the relationship between the parties." *Powell Elec. Sys., Inc.*, 356 S.W.3d at 119. Capitol points to no additional summary judgment evidence on this issue and, without more, the Court cannot conclude the "demurrage" damages assessed by third parties were "conclusively presumed to have been foreseen" by IPEC in the event of a breach of the contract. *Kiewit*, 2016 WL 4564472 at *9. As such, the Court agrees with IPEC that to the extent Capitol's "demurrage" damages are charges or fees that derive from Capitol's contracts with third parties they are appropriately characterized as consequential damages and are waived under Article 15.

Accordingly, as to Capitol's "demurrage" damages deriving from Capitol's contracts with third parties, IPEC's Motion for Summary Judgment is GRANTED. *ECF No. 32*.

## CONCLUSION

For the reasons stated above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** IPEC's Motion for Summary Judgment. *ECF No. 32*.

It is so ORDERED.
SIGNED this 8th day of May, 2025.


JASON  PULLIAM
UNITED STATES DISTRICT JUDGE